IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA           :
                                   :      CRIMINAL INDICTMENT
v.                                 :      NO.:  2:12-CR-022-RWS-JCF
                                   :
DAVEY HONEYCUTT and                :
PHILLIP HONEYCUTT                   :

## REPORT AND RECOMMENDATION

This case is before the Court on the motions to suppress evidence filed by Defendants Davey Honeycutt and Phillip Honey (Docs. 78, 81), seeking to suppress evidence seized from their residence without a warrant by law enforcement agents on August 16, 2012.  They have also filed motions to suppress statements (Docs. 79, 80), requesting that the Court suppress evidence of any statements they made to law enforcement agents on that date.  Because Defendants voluntarily consented to the agents' search of their residence, it is **RECOMMENDED** that Defendants' motions to suppress evidence be **DENIED.** Furthermore, because Defendants understood and voluntarily waived their rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and voluntarily made statements to the agents, is it **RECOMMENDED** that their motions to suppress statements also be **DENIED**.

1

## Background

An Indictment filed August 14, 2012 (Doc. 1) charges Defendants with conspiracy to aid and abet, and/or aiding and abetting "Michael Griffin, a/k/a Griff," in the possession or attempted possession of cocaine with the intent to distribute on specified dates.  (*See* Counts One, Two, Three, and Four).  In Count Five, Defendant Davey Honeycutt is charged with possession of a firearm by a convicted felon.  The Government has filed a Superseding Indictment (Doc. 154), which adds additional defendants, but does not alter the Court's analysis of the Honeycutt's motions.

As has been noted in prior orders, the underlying charges stemmed from an FBI undercover investigation into alleged criminal activities by members of the Outlaw Motorcycle Club and affiliated motorcycle clubs in north Georgia.  (*See, e.g.*, Doc. 116, Gov't Br. at 2).  The Government claims Defendants agreed to provide security for a series of meetings involving potential drug transactions.  (*See, e.g.*, Doc. 113, Gov't Br. at 3-4; Doc. 116, Gov't Br. at 16-18).

On August 16, 2012, Defendants Davey Honeycutt and Phillip Honeycutt were arrested on arrest warrants tied to the offenses charged in the Indictment.  (*See* Docs. 53, 54).  On September 18, 2012, Defendants filed the pending motions to suppress evidence and statements.  (Docs. 78 through 81). The Court conducted

2

a hearing on Defendants' motions on November 9, 2012 (*see* Doc. 130), and a transcript of the hearing was filed on December 7, 2012 (Doc. 138).[1]  Defendant Honeycutt filed a post-hearing brief in support of his motions on December 19, 2012 (Doc. 145), and Defendant Phillip Honeycutt adopted that brief (*see* Docs. 148, 149).  The Government filed a response brief on January 28, 2013 (Doc. 174), and Defendant Honeycutt filed a reply brief on February 28, 2013 (Doc. 228).  Briefing is complete, and the undersigned now considers the merits of Defendants' motions.

## **Facts**[2]

At the hearing, the Government presented the testimony of Paul "Greg" Simpson, a Special Agent with the Federal Bureau of Investigation ("FBI"); Alex Rivera, an Investigator with the Cherokee County Sheriff's Office; Marcus Brackman, a Special Agent with the FBI; and William Cromer, a Special Agent with the FBI.  Defendants countered with the testimony of Gregory ("Greg") Honeycutt, Davey Honeycutt's nephew; Roxanne Honeycutt, Davey Honeycutt's daughter; and Dennis Sadler, Roxanne Honeycutt's fiancé.  In determining the

---

[1] References to the transcript of the December 7, 2012 hearing are designated as "Tr. __."

[2] Because multiple members of the Honeycutt family were involved in the events at issue, for ease of reference, the Court often identifies the individuals by their first names.  The Court intends no disrespect to the Honeycutts.

relevant facts for purposes of deciding Defendants' motions, the undersigned has noted and resolved any material conflicts in the testimony.

Agent Simpson is assigned to the Memphis, Tennessee FBI office, and is the Senior Team Leader of a SWAT team which serves high-risk search and arrest warrants. (Tr. 8-9). On August 16, 2012, the Memphis SWAT team was responsible for executing federal arrest warrants for Phillip and Davey Honeycutt at 4312 Country View Circle, Gainesville, Georgia. (Tr. 9-10). These warrants were among many warrants being executed that day relating to the investigation. (*See* Tr. 10). Agents at the FBI office in Atlanta informed Agent Simpson and his team that these were high-risk arrests because the targets were considered armed and dangerous. (Tr. 40-41). At approximately 1:15 a.m., eleven members of the SWAT team gathered at the "command post," where they dressed in their uniforms, and checked their radios and equipment. (Tr. 10). The SWAT team members wore "crye precision multicam colored uniforms, standard FBI issued body armor, helmets, M4 rifle, [and] sidearms." (Tr. 10-11). The clothing identified them as members of the FBI SWAT team. (Tr. 11).

The team left the command post and went to a "staging location" to meet a another squad of approximately seven other federal, state and local law enforcement officers, who were assisting in conducting post-arrest searches and

conducting administrative duties regarding the arrests.  (Tr. 12, 52, 52, 121-23).
This group was lead by Alex Rivera, an Investigator with the Cherokee County
Sheriff's Office assigned to the FBI North Georgia Major Offender Task Force.[3]
(Tr. 12, 39, 50, 52).   Rivera briefed the support team officers, and provided
information he had received from case agent Mark Sewell about Davey and Phillip
Honeycutt, including the nature of the charges against them, i.e., drug and weapons
offenses.  (Tr. 12-14, 46, 55-56).  He also told the group that Davey Honeycutt was
a felon, had a criminal history involving concealed firearms and had a drug history,
that Phillip Honeycutt had been declared a habitual DUI offender, and that both
had a history of fighting.  (Tr. 56-58, 135).  Rivera also reported that information
suggested that there may be multiple guns in the house, including a rifle, and
handguns. (Tr. 14-15, 37, 59).   Rivera explained that "based on their criminal
history, nature of the offenses they were being charged with, that they were
considered armed and dangerous."  (Tr. 14).  The agents were under the impression
that three people lived in the residence, Davey Honeycutt and his wife Roxie, and
Phillip Honeycutt.  (Tr. 27, 66).  The agents had no information that children were
in the home.  (Tr. 14).

---

[3] As a member of the Task Force, Rivera was working on the FBI's undercover
investigation of the Outlaw Motorcycle Club and its affiliated clubs in North
Georgia.  (Tr. 51).

The SWAT team members traveled to Defendants' residence and arrived around 4 a.m.  (Tr. 16-17).  With little lighting in the area, agents "were under night vision."  (Tr. 18).  "Team Two," made up of four agents, went to the rear of the residence, and "Team One," made up of seven agents, including Agent Simpson, went to the front of the house.  (Tr. 18, 32-33).  The agents at the front of the house observed that a television was on and saw light in the front living room area.[4]  (Tr. 19).  The agents knocked on the door and announced "FBI warrant. FBI warrant."  (Tr. 21).  A motion detector light went on, and the agents in the front were "blinded," so Agent Simpson commanded the agents to breach the door following his countdown from five to one.  (Tr. 19-20, 43).  On "two," the agents set off a diversionary "flash bang," i.e., a device that creates "noise, a flash of light, and a little bit of smoke," in the back of the residence, and on "one," the agents breached the front and rear doors with a battering ram.  (Tr. 20-21, 43-44).  They breached the doors approximately five to ten seconds after they knocked on the door.  (Tr. 44).  The agents threw another flash bang device inside the front door into the front area of the residence, and one agent pointed his weapon into the living room area.  (Tr. 21-22, 45).  There were three children sleeping on the couch in the room where the flash bang device was thrown.  (Tr. 33-34, 194).  The

---

[4] One of the occupants of the house, Dennis Sadler, testified that he had fallen asleep around 2 a.m. watching television.  (Tr. 209, 211).

sounds of the flash bangs awoke the occupants of the house, which included Davey Honeycutt, Roxie Honeycutt, Phillip Honeycutt, Gregory Honeycutt, Davey and Roxie's daughter Roxanne Renee Honeycutt, Roxanne's fiancé Dennis Sadler, and Roxanne's three children.  (Tr. 24-27, 47-48, 64-65, 158-59, 193-94, 197, 208-09).

The agents pointed their weapons and yelled at the people inside the house to walk backward to the door, and as each adult reached the threshold of the door, the agents instructed them to kneel down, restrained their hands behind their backs with plastic "zip ties," took them outside of the residence, and placed them in a "holding area" on the grass.  (Tr. 23-24, 160-62, 171-73, 201-02, 210).[5]  The agents gave the children blankets and shoes and did not restrain the children, who were kept in a group with their mother, separate from the other adults.  (Tr. 25-26, 64, 174, 205).  At that point, none of the people taken from the house were free to leave.  (Tr. 38).

Agent Simpson believed that there might be additional people inside the house who posed a danger to law enforcement personnel, so agents did a "safety

---

[5] The witnesses dispute whether any SWAT member used profanity as they yelled at the occupants of the house.  (*See* Tr. 34, 199, 201, 209-10).  This dispute is not material as to whether Defendants later voluntarily consented to the search of their house or voluntarily waived their *Miranda* rights.  The undersigned accepts for purposes of this motion that one or more agents may have used the coarse language described by some of the occupants in connection with ordering the occupants to comply with the SWAT team members' commands.

7

clear" of the residence, i.e., "a nice, slow, methodical clearing of the residence, looking anywhere bodies could be." (Tr. 27). Four to five agents searched places where a person could hide, including closets, under beds, and clothes hampers. (Tr. 27-28). During their sweep, agents found a rifle case inside a closet in a bedroom, opened it and confirmed it contained a rifle, but did not seize it. (Tr. 28-30, 39). The sweep lasted approximately five to six minutes. (Tr. 30).

At that point, Agent Simpson contacted Alex Rivera to let him know his team could come to the house. (Tr. 30, 63). That call occurred approximately seven to ten minutes after Rivera heard the second flash bang. (Tr. 63). Simpson briefed Rivera about the entry into the house, identified the people removed from the house, showed Rivera the layout of the house, and pointed out rooms where firearms and/or ammunition had been found during the protective sweep. (Tr. 31, 65-71). While Rivera toured the house with Agent Simpson, other officers confirmed the identity of the adults who were outside the house to see if any had outstanding warrants. (Tr. 72, 177-78, 213, 217). Once the SWAT team made sure that Rivera had enough people to watch the occupants of the house, the SWAT team left to go to try to make another arrest, and turned over custody of Davey and Phillip Honeycutt to Rivera's team. (Tr. 31-32, 73). Rivera then allowed anyone who had been "cleared," i.e., anyone without warrants, to re-enter

8

the house and remain in the center part of the house, including the kitchen, dining room, and living room, with access to the bathroom, while Defendants remained outside. (Tr. 75, 77, 175). Rivera posted officers at the entrances to the rooms where firearms had been located to prevent anyone, including children, from accessing the firearms. (Tr. 75-76).

Rivera also brought Phillip Honeycutt into the house, confirmed that one of the bedrooms was his bedroom, explained to him why he was there, that he was under arrest, and presented him with a warrant. (Tr. 78). Rivera spoke with Phillip in a "very calm, low tone of voice," and Phillip was "very cooperative." (Tr. 79). Because Phillip was not wearing shoes, Rivera asked him to point out his shoes, and after Phillip identified them, an officer put the shoes on him, and Rivera walked him to the front of the house and "handed him off" to Agent Coffin. (Tr. 80).

Rivera later spoke with Phillip Honeycutt again while Phillip sat in the back of Agent Coffin's vehicle. (Tr. 80-81). Phillip was still handcuffed with his hands behind his back. (Tr. 81). Rivera sat in the back with him with the rear doors open, while Agent Coffin stood outside the vehicle. (Tr. 81). Rivera explained that he needed to read Phillip his *Miranda* rights before speaking with him since he was in custody. (Tr. 81). At 5:10 a.m., Rivera presented Phillip with an Advice of

Rights form, and held the form so that Phillip could read it while Rivera read from the form.  (Tr. 82-83; *see also* Gov't Ex. 1).  The form informs the reader that:

> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer for advice before we ask you any questions.
> You have the right to have a lawyer with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Gov't Ex. 1).  After Rivera finished reading the form, he asked Phillip if he understood his rights, and if he was willing to talk with Rivera, and Phillip responded, "Yes," he was willing to talk with Rivera.  (Tr. 84).  Then Rivera read the second part of the document entitled "Waiver of Rights," which states "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  (Tr. 84; *see also* Gov't Ex. 1).  Phillip stated that he would waive his rights and sign the form, so Rivera asked Agent Coffin to remove the handcuffs and handcuff Phillip in front so he could sign the form.  (Tr. 84-85).  Phillip then signed the form, and Rivera and Agent Coffin signed as witnesses.  (Tr. 85; *see also* Gov't Ex. 1).  Rivera spoke with Phillip in a "low, calm, relaxed tone of voice."  (Tr. 86).  Rivera's firearm was visible, but he did not point it at Phillip, threaten him, or make any promises to

him.  (Tr. 86).   Phillip then made statements concerning his involvement in the

charged offenses.  (Tr. 87).   Phillip "was very relaxed, very calm, and seem[ed]

pretty forward in anything that [Rivera] asked him."  (Tr. 87).

Rivera then asked Phillip for consent to search his bedroom.  (Tr. 87-88).

Phillip told Rivera that he shared the room with Gregory Honeycutt.  (Tr. 88).

Rivera explained "what the scope of the investigation was and what [he] would be

looking for," such as "anything that was related to the motorcycle club."  (Tr. 90-

91).  Rivera showed Phillip a Consent to Search form, which stated:

> 1.   I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:  Bedroom of Honecutt [sic], Phillip and Honecutt [sic], Gregory Scott
> 2.   I have been advised of my right to refuse consent.
> 3.   I give this permission voluntarily.
> 4.   I authorize these agents to take any items which they determine may be related to their investigation.

(Tr. 87; Gov't Ex. 2).  Rivera read the form to Phillip.  (Tr. 88-89).  Phillip gave

his consent to search his bedroom and signed the Consent to Search form.  (Tr. 89-

90; *see also* Gov't Ex. 2).  Rivera signed the form as a witness. (Tr. 90; *see also*

Gov't Ex. 2).  Phillip remained on the scene in Agent Coffin's car while they

conducted the search in case he decided to withdraw his consent.  (Tr. 91-92).

Meanwhile, Agent Brackman arrived at the house as part of the support

team, and he approached Davey Honeycutt, who was standing in front of the house

with his hands cuffed behind him, and moved him to a marked law enforcement vehicle where he placed him in the backseat.  (Tr. 140-42).  After Rivera finished talking with Phillip Honeycutt, he walked to the car in which Davey Honeycutt was sitting.  (Tr. 92, 142).  Rivera sat next to Davey while Agent Brackman stood outside the vehicle with the backseat door open so he could see and hear Rivera and Davey.  (Tr. 92-93, 142-44).  Rivera explained to Davey why he was under arrest and showed him the warrants.  (Tr. 93-94).  He told Davey that he wanted to talk with him, but that first he needed to read Davey his *Miranda* rights.  (Tr. 94, 143).  Rivera read those rights from an Advice of Rights form while showing the form to Davey so that he could read along as Rivera read from it.  (Tr. 95, 144). He asked Davey if he understood his rights, and Davey stated that he understood. (Tr. 95, 144).  Rivera also asked him if he would be willing to talk to Rivera, and Davey said he would, so Rivera read the Waiver of Rights section of the form.  (Tr. 95, 144-45).  Davey said that he was willing to sign the Waiver of Rights, so Rivera asked Agent Brackman to move Davey's handcuffs to the front of his body so he could sign, and Davey then signed the form.  (Tr. 96, 145).  Rivera and Brackman signed the form as witnesses.  (Tr. 96-97, 145-46).  Inexplicably, Rivera has been unable to locate the signed form.  (Tr. 96-97).  Rivera spoke with Davey in a normal volume, in a "calm, cool" tone, and Davey did not appear to be

12

agitated or distressed.  (Tr. 97-98, 146-48).  Neither Rivera or Brackman pointed weapons at Davey, threatened him, or made any promises to him.  (Tr. 97, 147).  After Davey signed the *Miranda* waiver, he made statements concerning the charges in this case.  (Tr. 98-99, 146).

Rivera also asked Davey who owned the property and any buildings on the property, and Davey said that he did.  (Tr. 100).  Rivera then asked him for consent to search the house and any other structures on the property, and read to Davey a consent to search form, like the form signed by Phillip Honeycutt (*see* Gov't Ex. 2).  (Tr. 100-01, 148-50).  Rivera advised Davey of his right to refuse his consent to search, and also advised him that during the search, agents would be permitted to take any items they determined might be relevant to their investigation.  (Tr. 101).  Rivera explained that the agents "would be looking for anything that would be related to the motorcycle club," including his leather vest or "cut," and Davey stated that he had returned the vest to the club.  (Tr. 103).   Davey also told Rivera that his wife had a permit for a handgun, and that there would likely be a handgun in the bedroom in his wife's purse.  (Tr. 103).  Davey gave his consent to search the house and another building on the property, and he signed the form; Rivera signed the form as a witness.  (Tr. 101-02).  Unfortunately, like the *Miranda* waiver signed by Davey Honeycutt, Rivera cannot find the Consent to Search form

Davey signed.  (Tr. 102).  Rivera did not tell Davey that if he withheld consent that Rivera would get a search warrant or try to search the property in another way, nor did he threaten Davey in any way.  (Tr. 101).  Davey also remained on the scene while the search took place in case he withdrew his consent to search as it went forward.  (Tr. 103-04).

Rivera then re-entered the house and told support team members that he had received consent to search the house and the structure next to the house.  (Tr. 104-05, 109).  Rivera repeatedly instructed team members that they were looking for motorcycle club paraphernalia, contraband, and firearms.  (Tr. 107).  While officers searched Davey Honeycutt's bedroom, Rivera spoke with Gregory Honeycutt and asked him for his consent to search the bedroom he shared with Phillip.  (Tr. 107-09, 128).  Greg also signed the Consent to Search form that Phillip had previously signed.  (Tr. 108, 164, 191; *see also* Gov't Ex. 2).

Investigator Rivera's account of his conversation with Greg about the consent varies from Greg's account.  For example, Rivera testified that, as he had with Phillip and Davey Honeycutt, he read Greg the Consent to Search form and explained that by signing the form, he authorized agents to take anything from the room they felt was necessary to their investigation.  (Tr. 108, 128).  Greg, on the other hand, testified that Rivera did not explain that he was asking for consent to

14

search his and Phillip's room, and Rivera did not read the Consent to Search form to him, nor did Greg read it before he signed it.  (Tr. 165-66, 188-90).  The undersigned finds that Rivera's account is more credible on this point.  In the first place, Investigator Rivera testified credibly as to how he obtained the *Miranda* waivers and consents to search from Davey and Phillip Honeycutt, including going over the *Miranda* waiver and Consent to Search forms with them.  (*See* Tr. 81-101).   Agent Brackman, who witnessed Rivera's conversation with Davey Honeycutt, corroborated Rivera's account.[6]  (*See* Tr. 142-50).  It is not credible that Rivera would have altered his procedure when asking Greg for consent, nor is it credible that he would have simply given Greg a Consent to Search form to sign without explaining that he was asking Greg for consent to search.  Furthermore, Greg testified that he could not read the form without his glasses, so officers retrieved them for him (Tr. 187), which undercuts his assertion that he did not read it.  At any rate, regardless of whether or not Greg read the form, he had the opportunity to do so, and he did sign it, thereby indicating that he voluntarily

---

[6] Defendants contend that Brackman's testimony is not reliable because he testified that Davey "confessed to selling the gun on the internet" (Tr. 148), but "this case has nothing to do with selling guns on the internet."  (Doc. 228, Reply at 7-8).  This case also involves an allegation that Davey Honeycutt sold a gun to an undercover agent (*see* Def. Ex. 29) however, and therefore, the undersigned does not find Brackman's recollection of events so faulty that his testimony should be disregarded.

consented to the search of his bedroom. More importantly, regardless of whether Greg's consent was valid, the agents were authorized to search the room based on *Phillip's* consent to search it. *See, e.g.*, *United States v. Sanders*, 315 Fed. Appx. 819, 822 (11th Cir. 2009) (unpublished decision) (explaining that "[a] third party may give valid consent to search if he or she has 'common authority over or other sufficient relationship to the premises or effects sought to be inspected.' " (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

Rivera also told the search team that they had consent to search Phillip's bedroom. (Tr. 109). The search of the house took fifteen to twenty minutes. (Tr. 110). The search team took photographs of all items before they were seized, and then took photographs of the items that were gathered to be seized. (Tr. 111-12). The officers seized a revolver, a rifle, "Outlaw" shirts, and cell phones from Phillip Honeycutt's room. (Tr. 112; *see also* Gov't Ex. 4). The officers seized from Davey Honeycutt's bedroom and the rest of the house an "AK-type rifle" and magazines, a handgun, items associated with the Outlaw Motorcycle Club or the Black Pistons Motorcycle Club, camera memory cards, Davey's cell phone, and a magazine for an unidentified gun. (Tr. 114-16; *see also* Gov't Ex. 5). After the search was complete, agents transported Phillip and Davey Honeycutt to the command post. (Tr. 117, 148, 151, 215).

16

## Discussion

### I.    Defendants' Motions to Suppress Evidence

Defendants argue that the Court should suppress evidence seized from their residence because: (1) the agents' entry into their residence violated the Fourth Amendment because they violated the "knock-and-announce" rule and used excessive force in entering the residence by detonating "bombs," i.e., flash bang devices; (2) the "plain view" doctrine did not justify the first search of their residence as part of the agents' "protective sweep"; and (3) their consent to search was not given voluntarily. (*See* Doc. 145, Def. Br. at 12-26).

#### A.    The Agents' Initial Entry

As an initial matter, the arrest warrants authorized the agents to enter Defendants' residence to arrest them. "For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). "*Payton* thus requires a two-part inquiry: first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must 'have reason to believe' that the suspect is within the dwelling." *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995). Defendants do not dispute that agents had a

17

reasonable belief that they lived in the house at issue or that they had reason to believe that Defendants were there at 4 a.m., and were therefore authorized to enter their residence to effectuate their arrest. Instead, Defendants contend that the agents' *manner* of entry into their residence violated the Fourth Amendment because they violated the "knock-and-announce" rule and used excessive force by using flash bang devices. (*See* Doc. 145, Def. Br. at 12-20).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. The Fourth Amendment "generally dictates that 'law enforcement officers [executing search and arrest warrants] must announce their presence and provide residents an opportunity to open the door.' " *United States v. Cole*, No. 1:09-CR-0412-ODE-RGV, 2010 U.S. Dist. LEXIS 82822, at *71-72 (N.D. Ga. Aug. 11, 2010) (quoting *Hudson v. Michigan*, 547 U.S. 596, 589 (2006)); *see also* 18 U.S.C. § 3109. The parties dispute the amount of time that elapsed between the agents' knock on Defendants' door and their entry into the residence, and whether that was a sufficiently reasonable amount of time to allow Defendants to respond. The Government contends that, based on Agent Simpson's testimony, five to ten seconds elapsed between the knock-and-announce

18

and the agents' entry (*see* Tr. 44), thus giving the occupants a reasonable amount of time to respond.  (Doc. 174, Gov't Br. at 21-22).  The Government further argues that, even if the agents forced entry "too soon, exigent circumstances existed to justify premature entry by the SWAT team."  (*Id.* at 22).  Defendants dispute those contentions, and assert that the agents breached without giving them a reasonable amount of time to respond to the knock-and-announce, and agents created the alleged exigency.  (*See* Doc. 145, Def. Br. at 14-15; Doc. 228, Reply at 8-12).

Even if the agents did not comply with the knock-and-announce requirement, "[a] failure to comply with the knock-and-announce requirement embodied in the Fourth Amendment does not trigger the exclusionary rule."  *Cole*, 2010 U.S. Dist. LEXIS 82822, at *73 (rejecting defendant's argument that evidence seized in alleged violation of "knock and announce" rule must be suppressed); *see also Hudson*, 547 U.S. at 599 (refusing to apply exclusionary rule to knock-and-announce violations).

With respect to the agents' use of a flash bang device as a diversionary tactic in entering Defendants' residence, it is hard to say the agents acted unreasonably given that they were there to effectuate two arrest warrants on individuals for drug and weapons charges; they had information that there were weapons, including a

rifle and handguns in the residence; and they had no information that children were in the house at all, much less sleeping in the living room where the flash bang was thrown.

Moreover, even if the agents acted unreasonably by throwing a flash bang device into the living room, suppression of evidence later seized from the residence is not necessary. Defendants have not pointed to authority, nor has the undersigned found any, that suppression of evidence seized from a house where agents gained entry while using a flash bang device is required, even where its use is considered to be excessive force.[7] *See United States v. Zamora*, 2005 U.S. Dist. LEXIS 40775, at *50-51 n. 19 (N.D. Ga. Dec. 7, 2005) (discussing the lack of Eleventh Circuit authority for the proposition that suppression of evidence is a proper remedy for an alleged excessive use of force in violation of the Fourth Amendment). In *United States v. Morris*, 349 F.3d 1009 (7th Cir. 2003), the Seventh Circuit considered, and rejected, an argument similar to Defendants' concerning the use of flash bang devices. There the defendant argued "that the use of [a] flash-bang device was unreasonable and that his inculpatory statements and

---

[7] Defendants cite cases in which courts have described injuries caused by flash bang devices and have criticized their use (*see* Doc. 145, Def. Br. at 16-17), but in none of those cases did the court suppress evidence as a result of the use of a flash bang device. Furthermore, there is no evidence that anyone was injured by the flash bangs utilized in this case.

the two guns should have been suppressed as fruits of a Fourth Amendment violation." *Id.* at 1012.  The court acknowledged that the Seventh Circuit "has often emphasized the dangerous nature of flash-bang devices and has cautioned that the use of such devices in close proximity to suspects may not be reasonable." *Id.* (citing *United States v. Jones*, 214 F.3d 836, 837 (7th Cir. 2000)).  However, the court further explained that the "exclusion of evidence under the Fourth Amendment requires more than unreasonable police behavior: 'the exclusionary rule depends on causation.' " *Id.* (quoting *Jones*, 214 F.3d at 838).  The court found that suppression of the evidence was not required "because Morris cannot show that the use of the flash-bang device caused the discovery of the guns or his inculpatory statements." *Id.* at 1013.  The court noted testimony similar to that in this case, i.e., "Morris's statements at the house were made in a 'chatty manner and were freely given," and "there was nothing about Morris's manner or speech that suggested he was confused or disoriented." *Id.*   Likewise, in *Jones*, the officers broke down a door with a battering ram and tossed a flash-bang device into the living room, but the court found that the defendant's statement, made 30 minutes after the allegedly unreasonable entry, was not caused by the entry where he "did not contend that 30 minutes after the entry he was still so disoriented by the explosion that the statement was involuntary." 214 F.3d at 837-38.

Similarly, in this case, even if the Court assumes that the agents acted unreasonably by throwing a flash bang into Defendants' house, that action did not cause Defendants to consent to search their residence or cause them to make their statements.  After the agents' entry, Defendants were removed from the residence, placed under arrest and put into patrol cars where Investigator Rivera spoke conversationally with them and advised them of their rights, including their right to remain silent and to refuse to consent to search.  Approximately an hour elapsed between the time agents entered the residence at 4 a.m. using the flash bang devices (*see* Tr. 16-17), and the time when Defendants waived their Miranda rights and consented to search their residence, shortly after 5 a.m. (*see* Tr. 82-83; Gov't Ex. 1).  The record does not suggest that Defendants were still so frightened or disoriented from hearing the flash bangs that they were unable to voluntarily waive their rights and give their consent, as discussed below.

## B.    The Protective Sweep

In *Maryland v. Buie*, 494 U.S. 325 (1990), the Court held that "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Id.* at 337.  A protective sweep can be

lawful even where the arrest occurs outside the house if the arresting officers have reasonable grounds to believe there are other persons inside the house who might present a security risk. *See Cole*, 2010 U.S. Dist. LEXIS 82822, at *75 n. 26. The protective sweep must be "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others," and must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327.

The undersigned finds that agents reasonably conducted a protective sweep of Defendants' residence in light of the fact that they had information that there were guns in the house, and there were six more people present in the residence than the agents suspected. Defendants argue, however, that the agents converted the protective sweep into an improper search when they opened a rifle case, and Defendants further contend that the Government has not met its burden of proving that the guns and ammunition that were seized were observed in plain view. (Doc. 145, Def. Br. at 20-23). The undersigned disagrees. Although agents opened the rifle case to confirm that there was a rifle in it, they did not seize the weapon at that time, nor is there evidence that they used the protective sweep as an opportunity to conduct a generalized search of Defendants' residence. The sweep lasted approximately five to six minutes (Tr. 30), and no evidence was seized during the

sweep. Instead, the agents seized evidence during their later search of the residence pursuant to Defendants' consent, as discussed below.

## C.   **Defendants' Consent to Search**

"[L]aw enforcement officers may search an individual's property without a warrant, as long as the individual voluntarily consents to the search." *United States v. Brumfield*, 352 Fed. Appx. 366, 367 (11th Cir. 2009) (unpublished decision) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219-22 (1973)). "Whether consent is voluntary is a fact question determined according to the totality of the circumstances," *Brumfield*, 352 Fed. Appx. at 367 (quotation omitted), and the government bears the burden of proving the existence and voluntariness of the consent. *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004). "Relevant factors include 'whether the person is in custody, the existence of coercion, the person's awareness of [his] right to refuse consent, the person's education and intelligence, and whether the person believes incriminating evidence will be found.' " *Brumfield*, 352 Fed. Appx. at 367 (quoting *Johnston v. Tampa Sports Auth.*, 530 F.3d 1320, 1326 (11th Cir. 2008)).

The undersigned finds that Davey Honeycutt voluntarily consented to the search of the house, and Defendant Phillip Honeycutt voluntarily consented to the search of his bedroom within the house. Although both were in custody in the

back of patrol cars when consent was given, there is no evidence that any agent threatened them, pointed his weapon at them while requesting their consent, coerced their consent, or made any promises to them in exchange for their consent. They were both informed, orally and in writing, that they had the right to refuse to consent, and they both indicated that they voluntarily consented to the search by signing Consent to Search forms.[8]   Rivera spoke with both Defendants in a normal, conversational tone, and both Defendants were cooperative and did not appear to be distressed.   Furthermore, although the agents kept Defendants at the scene during the search in case they withdrew their consent, there is no evidence that either withdrew his consent or objected to the search.

Defendants argue, however, that their consent was not voluntary due to the manner in which agents entered their residence, and because SWAT team members entered the home and searched it as part of their protective sweep. (*See* Doc. 145, Def. Br. at 23-26).   The undersigned is sympathetic to the understandable fear and

---

[8] Although Davey Honeycutt's Consent to Search form is missing, Investigator Rivera and Agent Brackman testified that he signed one, testimony that is supported by the fact that Phillip Honeycutt signed a Consent to Search form. (*See* Gov't Ex. 2).   In any event, the fact that David Honeycutt's Consent to Search form is missing is not dispositive because "the lack of a consent to search form does not automatically render consent involuntary."   *U.S. v. Edwards*, Criminal Action File No. 1:10–CR–132–RWS/AJ, 2010 WL 5184784, at *5 (N.D. Ga. Oct. 13, 2010), *adopted by* 2010 WL 5276983 (N.D. Ga. Dec. 15, 2010).

confusion the occupants of Defendants' house felt when the SWAT team used a battering ram to enter their home, accompanied by flash bang devices and armed individuals shouting commands. But by the time Defendants gave their consent to search the residence, circumstances had calmed considerably. When Investigator Rivera asked for their consent, approximately an hour after the initial entry, Defendants were sitting in the back of patrol cars in no apparent distress, with no weapons being pointed at them or agents yelling at them. *See, e.g.*, *United States v. Brown*, 223 Fed. Appx. 875, 880 (11th Cir. 2007) (finding that defendant, who was handcuffed and sitting in the back of a patrol car, voluntarily consented to the search because he consented at least ten minutes after traffic stop during which the officer drew his gun, and there was "no evidence that any officer had a gun drawn at the time [the defendant] was asked to consent to search").

These circumstances are no more coercive than those found in other cases where the Eleventh Circuit held the consent to be voluntary. In *United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993), for example, the court found defendant's consent to be voluntary even though he had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint," and "he had invoked his right to remain silent before consenting to the search." *Id.* at 1571. In that case, as in this case, agents

presented the defendant with a consent to search form after he was under arrest, and the defendant signed it. *Id.* at 1567. In *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989), the court found the defendant's post-arrest consent to search his residence was voluntary, even though fourteen agents were present when the defendant was arrested in his front yard; agents conducted a security sweep of his house; agents arrested him and led back into the house in handcuffs; and agents refused the defendant's conditional consent and requested to search the whole house "or else they would have to secure the house and apply for a search warrant." *Id.* at 357-62 and n. 4.

Defendants also seek to discredit Investigator Rivera's testimony about Defendants' demeanor and the manner in which he went over the consent form with them by pointing to the testimony of Greg Honeycutt about his own interactions with Rivera. (Doc. 145, Def. Br. at 24). In the first place, Greg did not witness Rivera's interactions with Phillip and Davey in obtaining their consent. Furthermore, as discussed above, the undersigned credits Rivera's account of how he obtained Greg's consent.

Greg Honeycutt also testified that he was "nervous and scared" when he signed the form because he had never been handcuffed before, and he was surrounded by armed officers, and he did not feel like he had a choice whether to

allow the officers to search his room because he "didn't know what they would do if [he] didn't sign [the form]," and "was scared it might just make everything worse" (Tr. 166), thus apparently attempting to call into question whether Defendants felt that they had a choice to withhold their consent.  Greg also admits, however, the agents were not yelling at him when they asked him to sign the form, but were speaking with him in a calm, matter-of-fact tone, and they were not pointing a weapon at him (Tr. 189-90), which is consistent with Rivera's account of how he spoke with Defendants and with Greg.  The fact that Greg Honeycutt may have felt more frightened than he appeared does not show that his, or more importantly, *Defendants'*, consent was not voluntary.   Furthermore, even if Defendants also felt more nervous than they appeared to Investigator Rivera, the undersigned "do[es] not believe that [their] nervousness resulted from extraordinary or unlawful police conduct." *Garcia*, 890 F.2d at 362.[9]

Because Defendants voluntarily consented to the search of their residence, it is **RECOMMENDED** that Defendants' motion to suppress evidence seized from their residence be **DENIED**.

---

[9] In *Garcia*, one of the agents testified that the defendant "told him that he had soiled his undergarments during the arrest," and the agent "returned to Garcia's home so that Garcia could exchange his undergarments."  890 F.2d at 362 n. 6. Thus, consent may be voluntary even when bodily functions are not.  No such extreme conditions are present in this case.

## II.    **Defendants' Motions to Suppress Statements**

Defendants argue that they did not knowingly and voluntarily waive their *Miranda* rights "because of the coercive atmosphere and the excessive show of force by the police the morning of August 16[.]"  (Doc. 145, Def. Br. at 26-27).

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  In *Miranda*, the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  Specifically, before a person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him.  *Id*. at 467-73.  The undersigned finds Defendants understood and voluntarily waived their rights under *Miranda*.  Investigator Rivera testified that he read Defendants their rights from the Advice of Rights form, allowed them to read their rights, and that they both signed the Waiver of Rights section of the form, indicating that they had read and understood their rights and were "willing to answer questions without a lawyer

present." (*See* Gov't Ex. 1).[10]  No agent threatened or coerced Defendants into waiving their rights, or made any promise in exchange for their waiver.  For the same reasons, the undersigned finds that they voluntarily made statements to law enforcement officers.[11]  *See Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989) (explaining that a statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence").

Because Defendants understood and voluntarily waived their *Miranda* rights and voluntarily made statements to law enforcement officers, it is **RECOMMENDED** that Defendants' motions to suppress their statements be **DENIED**.

### Summary

It is **RECOMMENDED** that Defendants' motions to suppress evidence and to suppress statements (Docs. 78, 79, 80, 81) be **DENIED**.

---

[10]  Although Davey Honeycutt's signed *Miranda* waiver form is missing, Investigator Rivera and Agent Brackman testified that he signed one, testimony that is supported by the fact that Phillip Honeycutt signed a *Miranda* waiver. (*See* Gov't Ex. 1).

[11]  When addressing a Fifth Amendment challenge to a statement, "[e]ven if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness." *Jarrell v. Balkcom*, 735 F.2d 1242, 1252 (11th Cir. 1984).

**IT IS SO REPORTED AND RECOMMENDED** this  29th   day of

March, 2013.

 /s/  J. CLAY FULLER
J. CLAY FULLER
United States Magistrate Judge

31